1  **WO**

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                        FOR THE DISTRICT OF ARIZONA

8

9   Russell Johnson,                    )   No. CV-11-8150-PCT-LOA
                                         )
10                   Plaintiff,          )   **ORDER**
                                         )
11  vs.                                  )
                                         )
12                                       )
    Carolyn W. Colvin, Acting Commissioner)
13  of the Social Security Administration,)
                                         )
14                   Defendant.          )
    _____)

15

16          Pursuant to 42 U.S.C. § 405(g), Plaintiff Russell Johnson ("Plaintiff") seeks judicial

17  review of the Commissioner of Social Security's ("Commissioner"[1]) denial of his

18  applications for disability insurance benefits and supplemental security income under Titles

19  II and XVI of the Social Security Act (the "Act"). (Doc. 1)  Plaintiff, through counsel,

20  requests the decisions of the Administrative Law Judge ("ALJ") and Appeals Council be

21  "reviewed, reversed, and set aside," his claims for disability benefits be allowed, and an

22  award of his reasonable attorney's fees and costs pursuant to 28 U.S.C. § 2412. (Doc. 31 at

23  16)  The parties consented to proceed before a magistrate judge on January 24, 2012. (Docs.

24  7, 17)  After review of the record, briefing, and the applicable law, the Court finds that the

25  Commissioner's decision to deny benefits is supported by substantial evidence and free from

26  legal error.

27
    _____
28          [1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February
    14, 2013, and is hereby substituted for her predecessor, Michael J. Astrue, pursuant to Rule
    25(d), Federal Rules of Civil Procedure. *See* 42 U.S.C. § 405(g); *Kilburn v. Colvin*, 2013 WL
    1104036 (W.D. Wash. Mar. 18, 2013).

**I. Procedural and Factual Background**

In October 2008, Plaintiff applied for disability insurance benefits and supplemental security income ("SSI") pursuant to the Act , 42 U.S.C. § 401 *et seq.* and 42 U.S.C. § 1382 *et seq.*[2] (Tr. 22[3]) Plaintiff alleged his disability started on October 1, 2007. His claims were initially denied on February 5, 2009, and again on reconsideration on June 30, 2009. (*Id.*) On July 16, 2010, an evidentiary hearing was held before ALJ George W. Reyes in Tucson, Arizona. (*Id.*) At the hearing, Plaintiff was not represented by counsel, but his mother, Kimberly Davenport, a non-lawyer, was allowed to assist Plaintiff as his representative. (Tr. 23, 43-44, 50) Plaintiff and a vocational expert, Kathleen McAlpine, testified at the hearing. The ALJ issued his final decision on November 10, 2010, finding Plaintiff is not disabled within the meaning of the Act. (Tr. 22; doc. 23-3 at 23) After considering Plaintiff's age, education, work experience, and residual functional capacity, the ALJ found Plaintiff is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. (Tr. 35; doc. 23-3 at 36)

After Plaintiff retained counsel and filed a timely request for review, on July 20, 2011, the Appeals Council issued its decision, finding the evidence presented "does not provide a basis for changing the Administrative Law Judge's decision." (Tr. 2) On September 21, 2011, Plaintiff filed his Complaint in the District Court of Arizona. (Doc. 1) The Commissioner filed an Answer on March 20, 2012. (Doc. 22) After multiple extensions, Plaintiff filed his opening brief on July 30, 2012. (Doc. 31) The Commissioner filed her opposition to Plaintiff's opening brief on September 7, 2012. (Doc. 36) Plaintiff did not file a reply brief and the matter is ready for ruling.

---

[2]  The Social Security Act provides for disability insurance benefits to disabled persons who have contributed to the Social Security program, 42 U.S.C. § 401 *et seq.*, and for social security income ("SSI") to disabled persons with low income, 42 U.S.C. § 1382 *et seq.*

[3]  (Tr. 22) (citations to "Tr. ___" are to the transcript which the Commissioner filed with the Answer. Title 42 U.S.C. § 405(g)). (Doc. 23 and attachments)

Plaintiff was born on April 19, 1987 and was 20 years of age on the alleged disability onset date of October 1, 2007. (Tr. 22, 33)  He has a high school education. (Tr. 195) He has worked as a Tucson nightclub bouncer from May 2006 to January 2008, Tr. 55,[4] 79; a fire watcher for a contractor at a Washington naval base before he voluntarily moved to Tucson, Tr. 57; and, according to a March 1, 2007 medical record, he was also to begin working as a Tucson car salesman. (Tr. 33, 79-80, 257)  Plaintiff enlisted in the United States Marine Corps, but received a "fraudulent enlistment" discharge[5] after one year in May 2006 due to a benign brain tumor. (Tr. 257, 820) During his time in the Marines, Plaintiff did not have paranoid thoughts, hear voices or have hallucinations, but some of his medical records indicate he reported a "mental break" when drill instructors threatened his family as a way to motivate him to get in shape and lose weight. (*Id.*; 871) He severely sprained his left ankle during boot camp and periodically re-injures it when it rolls out laterally. (Tr. 862) Plaintiff reported he left his job as a fire watcher because of his ankle problem and difficulty going up and down stairs. (Tr. 257) At the hearing, Plaintiff admitted he does not use a cane or walker to ambulate. (Tr. 74)

**II. Medical Evidence Regarding Impairments**

At the July 16, 2010 hearing, Tr. 41-96, Plaintiff testified he suffers from "chronic ankle sprain,"[6] Tr. 30, 60-61, 886; a benign brain tumor[7] which was surgically removed

---

[4] Plaintiff testified he was fired for letting someone underage into the club with a fake ID. (Tr. 56)

[5] Plaintiff testified the fraudulent enlistment discharge was due to his failure to disclose his brain tumor at time of enlistment. (Tr. 66-67)

[6] Plaintiff testified, and the ALJ's written decision notes, he was granted a 10% disability for his chronic left ankle sprain which occurred when he was in the Marines, but his attempts to have this disability upgraded to 100 percent by the VA has been denied three times. (Tr. 30, 60) As of March 1, 2007, Plaintiff had not worn an ankle brace since his discharge from the Marines in May 2006. (Tr. 257)

[7] The removed benign tumor, called a "low grade astrocytoma," was first diagnosed when Plaintiff was 14 years old and, although he complained of headaches while on active

(craniotomy) in February 2008, Tr. 60, 306; schizophrenia, Tr. 61; migraine headaches; irritable bowel syndrome; and insomnia. (Tr. 30) He testified his worst medical problem since October 1, 2007 was the schizophrenia, which he claimed causes hallucinations and him to hear voices. (Tr. 30, 61-62) The second worst medical problem was the migraine headaches he relates to the brain surgery. (Tr. 30, 62) Plaintiff obtains health care through the Veterans Administration ("VA") and has been seen by Floyd Thompson, M.D., a treating staff psychiatrist, since 2008. (Tr. 24, 62-63)  Plaintiff provided evidence of his frontal lesions and craniotomy, tr. 782-783; his taking Dilantin[8] for seizures, tr. 606., Risperidone capsules and Risperdal Consta[9] injections for schizophrenia, tr. 225[10]; and other prescription medication.

The Commissioner reported that although Plaintiff's medications changed during this period, the testimony indicated he stabilized and no longer had hallucinations. (Doc. 36 at 3)  In addition, Plaintiff participated in massage therapy, where his mood was reported as "good," and he was not depressed. (*Id.*)  Plaintiff reported he was taking medications for his psychotic symptoms, but his mood was good and he was sleeping well. (Tr. 480)  The Commissioner indicated that a VA psychiatrist, John Jachna, M.D., evaluated Plaintiff in November 2007, and noted that Plaintiff's symptoms were "nearly resolved." (Tr. 708)

The record reflects Plaintiff underwent a right frontal craniotomy to remove a benign brain tumor or lesion in February 2008. (Tr. 782, 819) In March 2008, Plaintiff reported less frequent headaches. (Tr. 586)  Plaintiff is prescribed several medications. (Tr. 475, 599)

---

duty, the headaches were not caused by his military service. (Tr. 261, 306, 586)

[8] Dilantin is a "medication used to control (prevent) seizures (convulsions) or stop an ongoing series of seizures." *See* www.medicinenet.com/script/art/article.htm (last viewed on March 27, 2013).

[9] "Risperidone  (Risperdal) is an atypical antipsychotic drug that is used for treating schizophrenia, bipolar mania and autism." *See* www.medicinenet.com/risperidone/article.htm (last viewed on March 27, 2013). The generic name is Risperidone; the brand name is Risperdal Consta. (*Id.*)

[10] This is a list of his medicine he was taking on June 19, 2009.

After a follow up appointment in July 2008, Plaintiff reported his mood, sleep and appetite were good and he was not suffering side effects from his medication. (Tr. 480) On September 5, 2008, Plaintiff reported to his doctor he was "doing well" and was not "depressed 'at all.'" (Tr. 475) But then, Plaintiff was hospitalized for three weeks in the fall of 2008 for complaints of severe paranoia and hallucinations. (Tr. 466) Upon his discharge from the VA hospital, Adolfo Martinez-Castelo, M.D., a VA a psychiatrist, reported Plaintiff was not expected to maintain gainful employment for the next 12 months due to his psychosis. (Tr. 264)

Plaintiff was seen by Floyd Thompson, M.D., a VA psychiatrist who inherited Plaintiff's care from Dr. Jachna on September 8, 2008, for a follow-up appointment on January 9, 2009. (Tr. 886, 896) In January 2009, Plaintiff reported "he was doing well overall," denied psychotic symptoms, and the Risperdal Consta injections "have eliminated his hallucinations." (Tr. 886) In a VA letter, dated April 6, 2009, Dr. Thompson diagnosed Plaintiff with schizophrenia, paranoid type. (Tr. 896) Plaintiff's symptoms at that time "include[d] social isolation, affective flattening, paranoia, and audio/visual hallucinations. These symptoms are chronic and negatively impact his ability to work and engage in interpersonal relationships." (*Id.*) Dr. Thompson concluded that, in his professional opinion and based on Plaintiff's symptoms, Plaintiff is precluded "from engaging in any type of gainful employment."[11] (*Id.*) Dr. Thompson wrote an additional letter on January 15, 2010, stating Plaintiff's highly symptomatic condition and the severity of his schizophrenia "completely preclude [Plaintiff] from any type of meaningful employment." (Tr. 905-06) However, on March 11, June 3, July 2 and 16, 2010, at follow-up appointments, Plaintiff

---

[11] The record also contains a copy of an October 6, 2008 letter from Adolfo Martinez-Castelo, M.D., a VA physician, indicating Plaintiff "is not expected to maintain gainful employment for the next 12 months due to his diagnosis of Psychosis NOA." (Tr. 264) Plaintiff did not develop the doctor-patient relationship between Dr. Martinez-Castelo and Plaintiff and the medical basis for Dr. Martinez-Castelo's opinion. The ALJ declined to give controlling weight to Dr. Martinez-Castelo's opinion because it was "conclusory and provide[d] no basis for further evaluation of his assessment." (Tr. 32, 264)

1    denied any psychotic symptoms. (Tr. 963-65; 986)

2        In January 2009, Plaintiff was seen by Hunter Yost, M.D., a Board certified

3    psychiatrist with a State Agency, for a consultive psychiatric evaluation and certified written

4    report. (Tr. 819-23) According to Dr. Yost, Plaintiff stated his current antipsychotic

5    medications have been helpful in decreasing the voices.(Tr. 27, 821-22) Plaintiff denied any

6    abuse of alcohol or drugs. (Tr. 27, 820)  Upon examination, Dr. Yost found Plaintiff's

7    sensorium was clear, he had no significant cognitive limitations. (Tr. 821) Dr. Yost reported

8    Plaintiff's grammar and vocabulary was adequate; he appeared articulate and well spoken,

9    and insight and judgment were fair. (Tr. 821)  Dr. Yost noted Plaintiff had little desire to

10   pursue any productive activities and had no plans for his future "other than playing video

11   games." (Tr. 822) Regarding his daily activities, Plaintiff informed Dr. Yost that he gets up

12   about 2 or 3 o'clock in the afternoon, watches television and plays video games most of the

13   day, sometimes walks his dog,[12] does his own laundry, some minimal cleaning, occasionally

14   prepares some food, about once a month goes out to a bar with his roommate for 10 to 15

15   minutes, does not drive a car, and goes to bed between midnight and 2:00 a.m. (Tr. 820)  Dr.

16   Yost diagnosed Plaintiff with a psychotic disorder, not otherwise specified, and cannabis and

17   cocaine abuse, according to previous records. Dr. Yost concluded Plaintiff does not have

18   significant limitations regarding his memory, understanding, concentration and persistence

19   and is able to manage benefits in his behalf. (Tr. 822)

20       Following a Medical Residual Functional Capacity Assessment on February 3, 2009,

21   Jaine Foster-Valdez, Ph.D., a reviewing Tucson psychologist, determined Plaintiff was "not

22   significantly limited" in most of the categories. (Tr. 825-840)  Social Interaction was the

23   only category in which Plaintiff was more "moderately limited" than "not significantly

24   limited." (Tr. 826) Dr. Foster-Valdez further found that if Plaintiff could comply with his

25   medication requirements and abstain from abusing alcohol, he is "able to meet all of the

26   basic mental demands of competitive, remunerative, unskilled work, including . . . [an

27

28       [12] According to his April 17, 2009 medical record, Plaintiff reported he was walking
     the dog 2-3 times a day to stay active to lose weight. (Tr. 869, 874)

1   ability] to understand, remember and carry out simple and detailed instructions[;] . . . make

2   simple work related decisions, maintain a simple schedule and complete simple tasks on a

3   consistent basis." (Tr. 827) Dr. Foster-Valdez opined Plaintiff would be best suited with

4   limited social contact due to his generalized paranoia. (*Id.*) She also noted that he "appears

5   to have limited experience making his own plans and may benefit from some vocational

6   guidance." (*Id.*)

7       On June 19, 2009, Plaintiff completed a "Seizure Questionnaire," and with the

8   assistance of his mother, submitted it to the Arizona Department of Economic Security. (Tr.

9   222-224)  In this questionnaire, Plaintiff reported he had seizures three times daily and that

10  he had over a 1,000 in the last year. (*Id.*) With respect to the question on body movements,

11  he stated his hands and feet shake. (*Id.*)  Following a seizure, he stated he has to lie down for

12  5-10 minutes to control his whole body from shaking. (*Id.*)  Plaintiff attached a list of his

13  active prescriptions. (Tr. 225) He stated the medications do not prevent his seizures, but they

14  lessen the severity of them. (Tr. 223)  On March 5, 2010, Plaintiff reported to Jack Dunn,

15  M.D., a VA neurosurgeon, that he was experiencing symptoms of visualizing wavy lines,

16  which may last for up to three hours. (Tr. 987)  Dr. Dunn noted this may possibly be seizure

17  activity. (*Id.*)

18  **III. Vocational Expert Testimony**

19      Upon questioning by the ALJ, the vocational expert testified that Plaintiff's prior

20  work history would be considered "light and semi-skilled" to "medium and semi-skilled."

21  (Tr. 78-80)  The ALJ then asked the vocational expert a hypothetical question involving

22  facts and limitations similar to Plaintiff's for examples of occupations that individual could

23  perform. (Tr. 84)  The vocational expert testified that under the scenario presented by the

24  ALJ, three potential occupations would be courier or messenger, a wrapper and an assembly

25  worker. (Tr. 84-85) When the ALJ asked for a fourth position, the vocational expert

26  identified a hand packager. (Tr. 86) On a follow-up question, Plaintiff's representative

27  inquired if Plaintiff cannot drive due to his medications, the vocational expert agreed

28  Plaintiff could not be a courier messenger, but could perform the other jobs. (Tr. 87-88 )

1    Finally, the ALJ clarified with the vocational expert's assistance, an employee taking time
2    off of work four or more times a month for medical appointments would not be acceptable
3    to the average employer. (Tr. 91-92)

4    **IV. Legal Standards**

5        **A. Standard of Review**

6        A district court must affirm the Commissioner's findings if they are supported by
7    substantial evidence and are free from legal error. *Sandgathe v. Chater*, 108 F.3d 978, 980
8    (9th Cir. 1997) (*per curiam*); *Smolen v. Chater*, 80 F.3d 1273, 1279  (9th Cir. 1997).
9    Substantial evidence means more than a mere scintilla, but less than a preponderance; it is
10   "such relevant evidence as a reasonable mind might accept as adequate to support a
11   conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citations omitted); *see also*
12   *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008).

13       In determining whether substantial evidence supports a decision, the court considers
14   the record as a whole, weighing both the evidence supporting and distracting from the ALJ's
15   conclusions. *Sandgathe,* 108 F.3d at 980 (citing *Andrews v. Shalala*, 53 F.3d 1035, 1039-40
16   (9th Cir. 1995)). The ALJ has an obligation to develop the record regardless whether the
17   claimant is represented by counsel or not. *Shaw v. Chater*, 221 F.3d 126, 131 (2nd Cir. 2000).
18   "When the evidence can rationally be interpreted in more than one way, the court must
19   uphold the Commissioner's decision." *Mayes v. Massanari*, 276 F.3d 453, 459 (9th Cir.
20   2001); *Tomasetti*, 533 F.3d at 1038.

21       **B. The Sequential Evaluation Process**

22       A "disability" is defined by the Act as an "inability to engage in any substantial
23   gainful activity by reason of any medically determinable physical or mental impairment
24   which can be expected to result in death or which has lasted or can be expected to last for a
25   continuous period of not less than 12 months." 42 U.S.C. § 423 (d)(1)(A); *see also Barnhart*
26   *v. Thomas*, 540 U.S. 20, 33 (2003).  An individual is disabled if "his physical or mental
27   impairment or impairments are of such severity that he is not only unable to do his previous
28   work but cannot, considering his age, education, and work experience, engage in any other

kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423 (d)(2)(A); *see also Mayes*, 276 F.23d at 460. The claimant bears the initial burden of proving disability. 42 U.S.C. § 423 (d)(5); *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). "A determination of whether an individual's impairments are of a sufficient medical severity to form the basis of eligibility for disability insurance benefits turns on the combined effect of all of the individual impairments." *Mayes*, 276 F.3d at 460 (citing 42 U.S.C. § 423(d)(2)(B) (Supp. 2001)). If the claimant shows he is unable to perform past relevant work, the burden shifts to the Commissioner to demonstrate that the claimant "can perform other substantial gainful work that exists in the national economy." *Takcett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

An ALJ determines an applicant's eligibility for disability insurance benefits by following the five steps listed below:

(1) determine whether the applicant is engaged in 'substantial gainful activity';

(2) determine whether the applicant has a 'medically severe impairment or combination of impairments';

(3) determine whether the applicant's impairment equals one of a number of listed impairments that the Commissioner acknowledges as so severe as to preclude the applicant from engaging in substantial gainful activity;

(4) if the applicant's impairment does not equal one of the 'listed impairments,' determine whether the applicant has the residual functional capacity to perform his or her past relevant work;

(5) if the applicant is not capable of performing his or her past relevant work, determine whether the applicant 'is able to perform other work in the national economy in view of his [or her] age, education, and work experience.'

*Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987) (citing 20 C.F.R. §§ 404.1520(b)-(f)). The claimant bears the burden of proof for steps one through four, but at the fifth step, the burden of proof shifts to the Commissioner. *Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001) (citing *Tackett*, 180 F.3d at 1098).

**C. Substance Abuse**

Pursuant to a 1996 amendment, the Social Security Act precludes an award of disability benefits if drug or alcohol abuse is a "contributing factor material to the Commissioner's

1   determination that the individual is disabled."   42 U.S.C. § 423(d)(2)(C); *see also Parra v.*

2   *Astrue*, 481 F.3d 742, 746 (9th Cir. 2007). Title 20 C.F.R. § 404.1535 sets forth guidelines for

3   determining whether a claimant's drug or alcohol abuse is a contributing factor material to the

4   determination of disability.  Section 404.1535 states that the "key factor . . . is whether we would

5   still find [the claimant] disabled if [claimant] stopped using drugs or alcohol." *Id.*  If a claimant's

6   current physical or mental limitations would remain absent the use of drugs or alcohol, and these

7   remaining limitations are disabling, then drug or alcohol abuse is not material to the disability,

8   and the claimant will be deemed disabled.  *Id.*  In other words, in accordance with 20 C.F.R. §

9   404.1535, the ALJ "separates out" the non-substance-abuse impairments and determines whether

10   the claimant would be disabled even if he stopped drinking or abusing drugs.  *Id.*; *see also Ball*

11   *v. Massanari*, 254 F.3d 817, 821 (9th Cir. 2001).  The Ninth Circuit has clarified that the "when

12   evidence exists of a claimant's drug or alcohol abuse, the claimant bears the burden of proving

13   that his substance abuse is not a material contributing factor to his disability." *Parra*, 481 F.3d

14   at 744-45.

15       Here, the ALJ found "the record establishes [Plaintiff has] an ongoing substance abuse

16   problem [and] the non-exertional limitations related to [Plaintiff's] mental impairments are

17   inextricably intertwined with his substance [illicit drugs only] abuse." (Tr. 31) The ALJ indicated

18   "[t]he State agency reviewing physician found [Plaintiff's] substance abuse to be a contributing

19   factor material to a finding of disability."  (*Id*.) (citing Exh. 9F, p. 3 and *Ball* ).  The ALJ found

20   Plaintiff failed to establish that, absent substance abuse, there would be greater limitations than

21   those assessed in this decision. (*Id*.)  Nevertheless, the ALJ found the Plaintiff was not disabled

22   based on Plaintiff's other alleged physical and mental impairments. (*Id*.)

23       **D. The ALJ's Decision**

24       Applying the five-step analysis, the ALJ found that: (1) Plaintiff had not engaged in

25   substantial gainful activity since October 1, 2007, the alleged onset date, Tr. 24; (2) Plaintiff

26   has severe impairments of status post surgery for benign glioma (brain tumor), headaches,

27   ankle disorder, psychotic disorder, and substance abuse; and (3) Plaintiff's impairment or

28   combination of impairments does not meet or medically equal the criteria of an impairment

listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 27)  At step four, the ALJ concluded that "[n]one of the claimant's impairments individually or in combination are accompanied by the signs and symptoms of the severity required in the Listing of Impairments." (*Id.*)  The ALJ further found Plaintiff's only physical limitation is standing and walking. More specifically, Plaintiff is

> [l]imited to standing and walking four to five out of every eight hours instead of the normal six out of every eight hours; he would be limited to the following simple or detailed routine repetitive tasks that involve only simple or detailed work related decisions; can respond to changes in a routine work setting; can work with things rather than people; consequently he  would be limited to jobs where he would have only occasional conversations and interpersonal interactions with supervisors and co-workers; and he would be limited to only incidental public contact.  Furthermore, he can attend to work and concentrate for two hours, then needs to take a break, can then attend and concentrate for two more hours, needs to take a break, etc., until he completes an eight hour day.

(Tr. 28-29) (bolding omitted)

In his written decision, the ALJ noted that, in Plaintiff's mother's March 2009 Disability Report Appeals, she reported Plaintiff's mood changes made her son not want to take his medication and she believed he was a danger to himself and others. (Tr. 29)

The ALJ opined that "[c]onsidering [Plaintiff's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform[.]" (Tr. 34) (bolding omitted). The ALJ indicated the vocational expert testified that considering his age, education, work experience, and residual functional capacity, Plaintiff is able to perform the requirements of unskilled light or sedentary "representative occupations," such as, a courier or messenger, a wrapper, an assembly or production worker, or hand packager. (*Id.*) The ALJ then set forth the numbers of potentially available jobs in the various fields provided by the vocational expert. (*Id.*)  In his written decision, the ALJ acknowledged that if Plaintiff cannot drive due to his medications, the vocational expert ruled out Plaintiff working as a courier/messenger, but she indicated "the other referenced jobs could be performed using public transportation." (*Id.*)

Significant to the ALJ's ultimate finding of no disability were Plaintiff's non-

compliance with his prescription medicine regimen specified by his physicians and psychiatrists, his doubtful credibility,[13] and his illicit drug usage. First, the ALJ cited Plaintiff's records to support Plaintiff's failure to take his medicine as directed. (Tr. 31) (citing exhibits 3F; 12F, pp. 34-35; 18F, p. 64) The ALJ found Plaintiff's "noncompliance does not support the alleged intensity and duration of his subjective complaints." (*Id.*) Plaintiff's records support these ALJ findings. Here are a few representative, but not exhaustive, examples. Plaintiff's October 10, 2008 VA hospital discharge summary indicates that "[o]ver the weekend [Plaintiff] visited his grandmother and did not have his medications with him. He did not take his meds from Friday morning until Monday night." (Tr. 305) Plaintiff "also has not taken his Phenytoin since it ran out 3 months ago."[14] (*Id.*) An April 1, 2008 hospital discharge note indicates Plaintiff was informed of the importance that he take his medicine as prescribed which was emphasized to him. (Tr. 495)  However, a March 9, 2009 medical record reflects Plaintiff reported "he has stopped [taking] Risperdal tabs and Benztropine." (Tr. 875)  At times, Plaintiff forgets to order his refills in a timely fashion and runs out. (Tr. 882) For example, Plaintiff was out of his medicine on February 13, 2009. (*Id.*); *see also* Tr. 591 (on March 10, 2008, Plaintiff reported he "[r]an out of RISPERIDONE 3-4d ago; has been more antsy.")

Secondly, the ALJ referenced Plaintiff's denial of alcohol and illicit drug usage in some of his medical records and during Dr. Yost's January 2009 evaluation, but Plaintiff reported alcohol use in September 2009 and drinking three beers the night before seeing Dr.

---

[13] Plaintiff does not raise as error the ALJ's finding of numerous inconsistencies in the record as a whole "which cast doubt [on] the credibility of [Plaintiff's] testimony[,]" such as, his allegations of "paranoia, hallucinations and dealing with people, but the record documents improvement in these symptoms with medication compliance and abstinence from [illicit] drug use." (Tr. 30)

[14] Phenytoin, the generic name for Dilantin, "[i]s an anti-seizure medication (anticonvulsant) used for preventing or treating generalized tonic-clonic (grand mal) seizures, complex partial seizures (psychomotor seizures), and seizures occurring during or after neurosurgery. " *See* www.medicinenet.com/phenytoin/article.htm (last viewed on March 27, 2013).

Thompson in March 2010. (Tr. 31) According to the ALJ, Dr. Thompson's medical plan notes included "abstinence from alcohol and cannabis" and "[t]he record is replete with reference to [Plaintiff's] ongoing use of marijuana." (*Id.*) (citing Exh. 18F, PP. 69-70, 138); *see also* Tr. 590 ("[C]annabis dependence, continuous use; Cocaine abuse, episodic use; and Nicotine Dependence[]" is reported on March 10, 2008, less than two weeks after his February 29, 2008 brain surgery). Importantly, ALJ writes the record shows "improvement in the [Plaintiff's] symptoms when he has been medication compliant and when abstinent from alcohol and drugs, either due to hospitalization or by his own self report." (Tr. 32)

### E. The Appeals Council Decision

Upon review, through Tucson attorney David Anaise, the Appeals Council denied Plaintiff's request for review on July 20, 2011. (Tr. 1, 14) The Appeals Council concluded "[w]e found no reason under our rules to review the Administrative Law Judge's decision." (Tr. 1) The Appeals Council noted it had considered the reasons Plaintiff disagreed with the ALJ's decision as well as additional evidence listed on the Order of Appeals Council. (*Id.*) This additional evidence Plaintiff submitted was the brief from David Anaise, M.D., J.D. (Exhibit 16E) and Medical Marijuana Physician Certification, dated May 11, 2011 (Exhibit 19F). (Tr. 5)

## V. Controlling Legal Authority

### A. Determination Regarding Presumptive Disability

Based on the standards set forth above, the ALJ ultimately found Plaintiff was not disabled under the Act. This decision was based, in part, on the vocational expert's testimony. (Tr. 35) The vocational expert testified to Plaintiff's residual functional capacity[15] ("RFC") to perform the full range of light work. He testified Plaintiff's "ability to perform all or substantially all of the requirements of [the full range of light work] has been impeded by additional limitations." (Tr. 34)  Based on his evaluation, the vocational expert concluded

---

[15] Residual functional capacity is a claimant's "ability to do physical and mental work activities on a sustained basis despite limitations from his impairments."  (Tr. 23) Simply stated, RFC is "what the individual can still do despite [the] limitations." *Mayes*, 276 F.3d at 460 (citing 20 C.F.R. § 404.1545 (2000)).

1   Plaintiff would be able to perform the requirements of representative occupations such as a

2   courier or messenger, a wrapper, or hand packager.(*Id.*)  Plaintiff's representative questioned

3   the vocational expert whether a person who was unable to drive due to medication taken

4   could perform the job of a courier or messenger, to which the vocational expert responded

5   that such a limitation would preclude employment as a courier or messenger. (*Id.*; Tr. 87) In

6   addition, the ALJ posed hypothetical questions to the vocational expert regarding Plaintiff's

7   potential limitations. (*Id.* at 34-35) In his decision, the ALJ wrote that the vocational expert's

8   testimony was consistent with information contained within the Dictionary of Occupation

9   Titles. (*Id.* at 35)  He further noted that the vocational expert cited the sources that she used

10  in reaching her conclusions. (*Id.*)  The ALJ continued that "[b]ased on the testimony of the

11  vocational expert . . . considering the claimant's age, education, work experience, and

12  residual functional capacity, [Plaintiff] is capable of making a successful adjustment to work

13  in jobs that exist in significant numbers in the national economy." (Tr. 35)

14              **B. Weight Given to Physicians and Other Medical Opinions**

15          Generally, the opinion of a treating physician is afforded greater weight than the

16  opinion of a nontreating physician. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir.

17  1989). However, the ALJ need not accept the opinion of any physician, including a treating

18  physician, if that opinion is brief, conclusory, and inadequately supported by clinical

19  findings. *See Bray*, 554 F.3d at 1228. Further, a physician's opinion is not conclusive as to

20  either the existence of a medical condition or the ultimate issue of disability. *Tonapetyan v.*

21  *Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001). Indeed, a physician's statement that a claimant

22  is disabled does not constitute a medical opinion at all and, thus, is not entitled to any special

23  significance. *See* 20 C.F.R. §§ 404.1527(d), 416.927(d).

24          "The ALJ must consider all medical opinion evidence." *Tommasetti*, 533 F.3d at 1041

25  (citing 20 C.F.R. § 404.1527(b)).  If a treating or examining physician's medical opinion is

26  supported by medically acceptable diagnostic techniques and is not inconsistent with other

27  substantial evidence in the record, that physician's opinion is given controlling weight.

28  *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001); 20 C.F.R. §404.1527(d)(2);

Social Security Ruling (SSR) 96-2p. While not bound by a medical expert opinion, the ALJ must provide "'specific and legitimate' reasons for rejecting the opinion of a treating physician." *Id.* "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating [the ALJ's] interpretation thereof, and making findings." *Tommasetti*, 533 F.3d at 1041 (citation omitted). Furthermore, "[an] ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory and inadequately supported by clinical findings." *Bray v. Comm'r*, 554 F.3d 1219, 1228 (9th Cir. 2009). If the treating physician's opinion is uncontroverted, the ALJ's reasons for rejecting the opinion must be clear and convincing. *Smolen*, 80 F.3d at 1285. If treatment can reasonably alleviate an impairment, then the impairment cannot serve as a basis for a finding of disability. *See Warre v. Barnhart,* 439 F.3d 1001, 1006 (9th Cir. 2006) (citing definition of "medical improvement" pursuant to 20 C.F.R. §416.99a(c)).

### C. Claimant's Credibility

The ALJ is responsible for resolving conflicts, determining credibility, and resolving ambiguities. *Andrews*, 53 F.3d 1035 at 1039; *Magallanes*, 881 F.2d at 750. A two-step analysis is used "to assess subjective testimony where, under step one, the claimant 'must produce objective medical evidence of an underlying impairment' or impairments that could reasonably be expected to produce some degree of symptom." *Tommasetti*, 533 F.3d at 1039 (citation omitted). "If the claimant meets this threshold and there is no affirmative evidence of malingering, 'the ALJ can reject the claimant's testimony about the severity of [the] symptoms only by offering specific, clear and convincing reasons for doing so.'" *Id.*

There are many factors an ALJ may properly consider in weighing a claimant's credibility, including, but not limited to:

> (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid;

> (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment;

1    (3) the claimant's daily activities.

2
3    *Smolen*, 80 F.3d at 1284; *see also Bunnell,* 947 F.2d at 346; *Turner v. Comm'r*, 613 F.3d
4    1217, 1224 at n. 3 (9th Cir. 2010). If sufficient evidence supports the ALJ's determination,
5    a district court cannot substitute its own determination. *See Young v. Sullivan*, 911 F.2d 180,
6    184 (9th Cir. 1990). Moreover, if a reasonable mind could understand the evidence to support
7    either outcome, a district court must defer to the ALJ's decision. *Batson v. Comm'r*, 359 F.3d
8    1190, 1193 (9th Cir. 2004). If, on the record as a whole, substantial evidence supports the
9    ALJ's decision and it is free from legal error, a district court must affirm it. *See Hammock
10   v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989); 42 U.S.C.A. § 405(g).

11       Although an ALJ may find a claimant's allegations not credible, the ALJ must make
12   specific findings which support this conclusion. *Bunnell*, 947 F.2d at 345. The findings must
13   be sufficiently specific to allow a reviewing court to determine that the decision was made
14   on permissible grounds and not arbitrarily discredited.  *Id.* at 345-46. Finally, a district court
15   may not reverse an ALJ's decision for harmless error, which exists when it is clear from the
16   record that the ALJ's error was inconsequential to the ultimate nondisability determination.
17   *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 885 (9th Cir. 2006) (quoting *Stout v. Comm'r,*,
18   454 F.3d 1050, 1055-56 (9th Cir. 2006) (internal quotation marks omitted)).

**VI.  Analysis**

19       In support of his request for review of his disability benefits claim, Plaintiff presents
20   the following claims of error:

21       (1) There was no substantive evaluation of the effects of the Plaintiff's chronic, daily
22   seizures followed by migraine tunnel vision, or the effects of his seizure medication, doc. 31
23   at 2;

24       (2) The ALJ erred in failing to give controlling weight to the opinions of Plaintiff's
25   treating physicians, which were supported by the medical record and by giving greater
26   weight to the findings of the State Agency Consultant's report, which were inconsistent with
27   the treating physicians' opinions and Plaintiff's medical records, *id.*;

28       (3) The ALJ misrepresented the opinion evidence of the Vocational Expert to

1    Plaintiff's detriment, *id.*

2        **A. Plaintiff's First Claim of Error**

3        For his first claim of error, Plaintiff indicates there was substantial medical evidence

4    regarding Plaintiff's seizure condition and how it affected his ability to function, including

5    his medication's limited ability to control the seizures. Plaintiff maintains, however, this

6    evidence was not included in the ALJ's findings regarding a severe impairment. (Doc. 31 at

7    6) Additionally, Plaintiff states the ALJ did not adequately develop the record and it appears

8    to him that all of the records were not reviewed. Plaintiff further believes the ALJ erred by

9    not having another hearing after all the records were made available and by relying on the

10   opinions of medical experts who did not have all of the relevant information before them.

11   (*Id.*)

12       The Commissioner argues this contention lacks merit, claiming the ALJ explicitly

13   considered Plaintiff's alleged daily seizures, headaches, and tunnel vision and citing the

14   ALJ's written decision, which discussed the alleged onset and frequency of his seizures, that

15   were purportedly "preceded by headache, colored light, tunnel vision, and dizziness[,]"

16   according to the seizure questionnaire completed by Plaintiff's mother. (Doc. 36 at 12) (citing

17   Tr. 30 and Exhs. 6E and 7E). The Court agrees.

18       As the ALJ discussed in his written decision, the medical record as a whole showed

19   Plaintiff had less severe headaches after he underwent his surgery for removal of the brain

20   tumor on February 29, 2008. (Tr. 586, 782) Following this surgery, Plaintiff was prescribed

21   anti-seizure medication, Tr. 599, and the subsequent medical record does not support

22   Plaintiff's claim of ongoing daily seizure activity when taking his medication as prescribed.

23   For example, two-weeks after his surgery, Plaintiff reported that with Dilantin, he had "less

24   frequent headaches and less intensity." (Tr. 586-87) As the ALJ noted, Plaintiff reported an

25   increase in seizures in a September 17, 2008 medical record, admitting he was "suppose[d]

26   to be taking dilantin daily but he had not taken it x 2 [for two months] because he was out."

27   (Tr. 26, 466). The Commissioner notes that Plaintiff can point to only one subsequent medical

28   record when Plaintiff reported a migraine and seizure-like symptoms to VA neurosurgeon

Jack H. Dunn on March 5, 2010. Because this was "possible seizure activity Dr. Dunn switched his anti-seizure medication from Dilantin to Keppra. (Doc. 36 at 12-13) (citing Tr. 987). Thus, the ALJ correctly noted that Plaintiff's claim regarding the severity and persistence of his seizures and headaches was inconsistent with his medical record. *See Tommasetti*, 533 F.3d at 1039 ("ALJ may consider many factors in weighing a claimant's credibility," including "the claimant's . . . prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid." (citation and internal quotation marks omitted)). Plaintiff did not rebut this finding.

**B. Plaintiff's Second Claim of Error**

For his second claim of error, Plaintiff contends the ALJ "gave 'little weight' to the opinions of treating physicians Adolfo Martinez-Castelo, M.D., and Floyd Thompson, M.D." and gave greater weight to the State Agency's Consultant's report and findings which, Plaintiff claims, were inconsistent with the treating physicians' opinions and medical records. (Doc. 31 at 7)  Plaintiff argues the ALJ's rejection of the treating physicians' rating was improper because it was not supported by substantial evidence. (*Id.*)  He contends their opinions were based on evidence when Plaintiff was in extended treatment, with knowledge of the substance abuse issues, and with knowledge of two periods of extended sobriety during which the psychiatric symptoms continued to exist. (*Id.* at 8). Plaintiff argues that during the latter period, he was free from alcohol and drugs because he was tested, yet he still suffered from psychosis. (*Id.*) (citing Tr. 26-27) Plaintiff maintains that because he still had hallucinations during approximately two three-week periods of sobriety, it supports his position that he is still suffering from impairments absent the existence of substance abuse. He argues that it was error for the ALJ to not find that Plaintiff's symptoms persisted despite the absence of substance abuse.

Plaintiff further argues the ALJ's decision was improper because it was "based in part on the reports of State Agency consultants" and these reports were inconsistent with other evidence, including the opinions of treating therapists. Plaintiff maintains the ALJ gave greater weight to the opinions offered by the State Agency than those of the treating

physicians. (*Id*. at 10) (citing Tr. at 32-33)  For example, Plaintiff contends the ALJ erred by accepting examining psychiatrist[16] Dr. Yost's opinion regarding Plaintiff's psychiatric condition, namely, that Plaintiff suffered from "mild" restrictions on his daily activities and he had "no significant limitations in understanding/memory/sustained concentration/persistence." (*Id*. at 10-11, citing Tr. 32) According to Plaintiff, the record indicates he "has had a significant history of specific, recurring hallucinations and delusion." (*Id*. at 11-12) Plaintiff additionally contends the ALJ erred when he gave "significant weight" to a non-examining psychologist/medical consultant who performed only a record review. (*Id*. at 12) In sum, Plaintiff contends the ALJ's reliance on these two opinions did not constitute substantial evidence to reject the treating physicians' opinions.

The Commissioner contends the ALJ gave specific and legitimate reasons for rejecting the medical opinions of the treating physicians that Plaintiff's mental impairments precluded him from performing any substantial gainful activity. (Doc. 36 at 16) The Commissioner argues Dr. Martinez-Castelo's opinion was conclusory and was rendered at the time of Plaintiff's second hospitalization for increased psychotic episodes and Dr. Thompson's opinions were inconsistent with contemporaneous treatment records, which "unequivocally showed that Plaintiff's symptoms improved when he was compliant with treatment and abstinent from alcohol and drugs." (*Id*.) (citing Tr. 32, 475, 480, 708, 732, 894, 879, 886, 963-64, 986-87; *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003) (ALJ may reject a contradicted treating physician's opinion by providing specific and legitimate reasons supported by substantial evidence in the record)).

The ALJ made clear in his written decision he declined to give controlling weight to Dr. Thompson's and Dr. Martinez-Castelo's opinions that Plaintiff is unable to work because Dr. Martinez-Castelo's opinions were "conclusory and provide[d] no basis for further evaluation of his assessment[,]" Tr. 32, and neither physician indicated he "considered the effect of [Plaintiff's] ongoing substance abuse or medication noncompliance." (Tr. 32)

---

[16] Plaintiff concedes that Dr. Yost was "an actual examining psychiatrist," but argues that Dr. Yost had insufficient medical records available to him.  (Doc. 31 at 11)

1    "Therefore, these opinions are inconsistent with the contemporaneous treatment records."

2    (*Id*.) (citing exhibits 3F, pp. 97-201, 466-67; 12F, p. 47; 18F, pp. 56-59) Moreover, the

3    opinions of an examining physician, like Dr. Yost, which were based on independent clinical

4    findings, may serve as substantial evidence. *See Andrews*, 53 F.3d at 1041. Dr. Yost, an

5    examining psychiatrist, found that Plaintiff had moderate symptoms (GAF rating of 51-60),

6    but no significant limitations in understanding and memory, or in sustained concentration and

7    persistence (Tr. 821-22). Contrary to Plaintiff's argument, the ALJ could properly rely on Dr.

8    Yost's assessment of Plaintiff's mental functional capacity.

9         The Court finds the ALJ's residual functional capacity determination is supported by

10    substantial evidence. *See Jamerson v. Chater*, 112 F.3d 1064, 1067 (9th Cir. 1997)

11    (recognizing that, on substantial evidence review, "the key question is not whether there is

12    substantial evidence that could support a finding of disability, but whether there is substantial

13    evidence to support the Commissioner's actual finding that claimant is not disabled.").

14         **C. Plaintiff's Third Claim of Error**

15         In his last claim of error, Plaintiff contends that, at Step 5, the ALJ erred in making his

16    findings regarding Plaintiff's vocational ability because the ALJ relied on the State Agency's

17    opinions in which to form his hypothetical questions to the vocational expert, and then

18    proceeded to misrepresent the vocational expert's opinions in his final findings. (Doc. 31 at

19    13) Specifically, Plaintiff contends that the ALJ "appear[ed]" to use the opinions of Drs.

20    Foster-Valdez, Yost and Goodrich as the basis for the first two hypothetical questions posed

21    to the vocational expert. (*Id*. at 14) Plaintiff claims, however, when Plaintiff's mother asked

22    a question to the vocational expert regarding how much time off is permissible for the average

23    employer, the ALJ "ignored" the testimony that it would make Plaintiff unemployable. (*Id*.

24    at 15) The question was whether a hypothetical employee who has to take off work "four

25    times a month or more," can such an individual remain employed? (Tr. 91) The vocational

26    expert answered "no," because in the vocational expert's experience "employers give you 10

27    to 12 days per year." (*Id*.)

28         The Commissioner contends the ALJ's hypothetical question, which incorporated all

of Plaintiff's credible limitations, was appropriate and the ALJ was entitled to rely on the vocational expert's answer to that question. (Doc. 36 at 17) (citing *Valentine v. Comm'r*, 574 F.3d 685, 690 (9th Cir. 2009)). The Commissioner further indicates the ALJ was not bound to accept as true Plaintiff's unsupported claims or testimony,[17] or the likely frequency of Plaintiff's medical appointments predicated on a single December 11, 2009 medical record, that Plaintiff would miss work four times or more a month for medical appointments. In fact, there was no hearing testimony how often Plaintiff attended scheduled or unscheduled medical appointments.

The Court finds the ALJ did not err in either phrasing the hypothetical questions to the vocational expert or rejecting Plaintiff's unsupported claim regarding the frequency of Plaintiff's medical appointments predicated on a single medical record. Contrary to Plaintiff's suggestion, the ALJ was not bound to accept as true the restrictions set forth in hypothetical questions posed by Plaintiff during the hearing. *See Osenbrock v. Apfel*, 240 F.3d 1157, 1164-65 (9th Cir. 2001) ("An ALJ is free to accept or reject restrictions in a hypothetical question that are not supported by substantial evidence.") (citing *Magallanes*, 881 F.2d at 756-57)).

## VII.  Conclusion

The ALJ did not commit legal error in questioning Plaintiff's non-compliance with his prescription medicine regimen specified by his physicians and psychiatrists, his credibility, and his illicit drug usage or in failing to give controlling weight to Dr. Thompson's and Dr. Martinez-Castelo's opinions. Moreover, the record contains substantial evidence to support the ALJ's conclusion that Plaintiff was not disabled within the meaning of the Act and there are jobs that exist in significant numbers in the national economy Plaintiff can perform. The ALJ assessed Plaintiff's residual functional capacity and the Court must give deference to that assessment when it is supported by substantial evidence.

Accordingly,

**IT IS ORDERED** that the Commissioner's decision denying Plaintiff benefits is

---

[17] In fact, Plaintiff testified he saw Dr. Thompson only two times a month. (Tr. 63)

1   hereby **AFFIRMED**. The Clerk is directed to terminate the judicial review of the decision by

2   the Commissioner of Social Security Administration.

3       Dated this 29th of March, 2013.

4

5

6                       Lawrence O. Anderson
                        United States Magistrate Judge
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28